Cite as 2019 Ark. App. 392

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-19-274

| | |
|---|---|
| PATRICIA BRATTON | **Opinion Delivered** September 18, 2019 |
| APPELLANT | APPEAL FROM THE CRAWFORD COUNTY CIRCUIT COURT [NO. 17JV-17-173] |
| V. | |
| | HONORABLE MICHAEL MEDLOCK, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | AFFIRMED |
| APPELLEES | |

## LARRY D. VAUGHT, Judge

Patricia Bratton appeals the Crawford County Circuit Court's order terminating her parental rights to her two children, E.B. and N.B. She challenges the sufficiency of the evidence to support the court's finding that termination was in the children's best interest. We affirm.

The Arkansas Department of Human Services (DHS) began investigating Bratton for child maltreatment when N.B. tested positive for amphetamines at birth in May 2017. Following the birth, DHS could not locate Bratton and her children until September 18, 2017. When DHS made contact with Bratton, she appeared to be hungover, was slurring her words, and had bloodshot eyes. She was living with her boyfriend, Jack Thomas. A drug screen administered to Bratton on September 18 revealed abnormal results based on its "lack of

temperature." DHS was unable to observe N.B. that day because she was being cared for by a babysitter who was identified as Bratton's friend, Meadow. Bratton's older daughter, E.B., told DHS that she wanted to go live with her "Nana." DHS set a follow-up meeting for September 20, 2017.

Bratton was an hour late for the September 20 meeting and failed to bring E.B. and N.B. as instructed. Bratton tested positive for methamphetamine on this date. Bratton then took DHS employees to observe the children, who were again at Meadow's house. The employees found Meadow's home to be extremely hot. Meadow and two men were frantically trying to clean the house and shut doors to various rooms. DHS informed Bratton that Meadow was not an appropriate babysitter. DHS scheduled a follow-up meeting for October 10, 2017.

Before that meeting occurred, DHS was informed on September 22, that E.B. had been coming to school hungry and with head lice and that she had been touching herself inappropriately at school. E.B. was absent from school on the day the report was made to DHS. On the same day, law enforcement requested DHS's assistance because N.B. had again been left at Meadow's home. When DHS arrived at Meadow's house, they found N.B. left alone in the care of a man named Austin Uselton, who was under the influence of drugs at the time, had drug paraphernalia around N.B., and had pending drug-related criminal charges.

DHS then exercised an emergency hold on both children, and the circuit court signed an ex parte order for emergency custody a few days later. On October 2, 2017, the circuit court held a probable-cause hearing at which it found that removal was warranted and that it was necessary for the children to remain in DHS custody. On November 2, the court adjudicated

the children dependent-neglected following the parties' stipulation as to Bratton's parental unfitness due to her continued use of alcohol and drugs and her history of leaving the children with inappropriate caretakers. The court found DHS's allegations in its original petition to be true and correct, and it found that Roger Blasingame is the legal father of E.B. The court set concurrent case goals of reunification and relative placement. It ordered Bratton to comply with the court's orders and follow the case plan.

On February 1, 2018, the court held a review hearing and found that both children had been placed together in foster care and that Bratton had only partially complied with the case plan. She visited the children regularly and maintained contact with DHS but had tested positive on drug screens and missed counseling sessions. The court also had concerns about Bratton's housing because she lived with unknown, unrelated individuals. The court ordered her to complete parenting classes, follow all recommendations resulting from her drug-and-alcohol assessment, submit to random drug screens and hair-follicle tests, obtain and maintain stable housing, obtain lawful employment, provide proof of income, maintain reliable transportation, visit the children regularly, demonstrate appropriate parenting skills, and cooperate with DHS.

On May 10, 2018, the court held a second review hearing. Again, the court found that Bratton had only partially complied with the case plan and court orders. She still lived with inappropriate individuals who continued to test positive for drugs. She also continued to miss counseling sessions. Although Bratton was in inpatient drug treatment at the time of the hearing, the court found that she had only minimally benefited from the goals of the case plan and had made very slow progress working the case plan. The court ordered that Bratton

3

comply with the case plan and court orders, and it continued the case goals as previously set. The court also warned Bratton that refusal to submit to drug screens or failure to provide a sample within thirty minutes would result in a screening deemed to be positive. The court ordered Blasingame to present himself to DHS upon his release from prison and ordered that Blasingame was to have no visitation with the children until that occurred.

On August 16, 2018, the court held a permanency-planning hearing at which it again found that Bratton had only partially complied with the case plan and court orders. Bratton had completed an inpatient drug treatment program, completed parenting classes, recently obtained employment, and had stable housing, but had also submitted drug screens with abnormal temperatures, tested positive for methamphetamine on a hair-follicle screen prior to her inpatient treatment, allowed E.B. to visit Blasingame in direct violation of court orders, returned the children to foster care with lice after visitation, and had not obtained and maintained reliable transportation. The court granted Bratton's request for another hair-follicle test and ordered her not to alter her hair in any way prior to that exam. The court granted Bratton an additional three months to work toward the goal of reunification. It also ordered her to attend family counseling with E.B. and abstain from all illegal substances. Bratton subsequently failed to attend the second hair-follicle test that the court had authorized.

On October 25, DHS filed a petition to terminate Bratton's parental rights.[1] Following a hearing, the court found that Bratton had failed to remedy the issues causing removal of the children, had failed to provide meaningful support for the children or maintain meaningful

---

[1]The petition also sought termination of Blasingame's parental rights, and his rights were ultimately terminated. Blasingame is not a party to this appeal.

4

contact with them, and had subjected them to aggravated circumstances. The court also found that termination was in the children's best interest after considering adoptability and the potential harm that might result if they were returned to Bratton's custody. This appeal follows.

Termination-of-parental-rights cases are reviewed de novo. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, at 9, 379 S.W.3d 703, 708. Grounds for termination of parental rights must be proved by clear and convincing evidence, which is that degree of proof that will produce in the finder of fact a firm conviction of the allegation sought to be established. *Id.*, 379 S.W.3d at 708. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.*, 379 S.W.3d at 708. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 379 S.W.3d at 708. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*, 379 S.W.3d at 708. Termination of parental rights is an extreme remedy and in derogation of a parent's natural rights; however, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.*, 379 S.W.3d at 708. As with all issues addressing child placement, the appellate court affords heightened deference to the circuit court's superior position to observe the parties personally and weigh credibility. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 215, 40 S.W.3d 286, 292–93 (2001).

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1)

the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. *Pine*, 2010 Ark. App. 781, at 9–10, 379 S.W.3d at 708–09. Additionally, the circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. *Id.* at 10, 379 S.W.3d at 709.

On appeal, Bratton only challenges the circuit court's finding that termination was in the children's best interest. Specifically, she alleges error in the court's finding that the children would be exposed to potential harm if returned to her care. The court found that "the juveniles would be subjected to potential harm because of the evidence presented above for termination, specifically . . . the instability of Patricia Bratton, and the unremedied drug use of Patricia Bratton."

In finding that termination is in the best interest of the child, the circuit court is required to consider the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii) (Supp. 2017). The circuit court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Rickman v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 261, at 4, 548 S.W.3d 861, 864 (citing *Dowdy v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 180, 314 S.W.3d 722). The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. *Id.*, 548 S.W.3d at 864 (citing *Samuels v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 527, 443 S.W.3d 599). Finally, a parent's past behavior is often a good indicator

6

of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. *Id.*, 548 S.W.3d at 864.

Here, Bratton argues that the evidence did not support the court's potential-harm finding because (1) she claims she last used illegal drugs prior to entering inpatient drug treatment and (2) she tested positive for oxycodone because she was taking it to treat back pain. Neither argument supports reversal. The court was not required to believe Bratton's self-serving testimony about the last time she used illegal drugs. *See Strickland v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 608, at 12, 567 S.W.3d 870, 877. Moreover, we cannot consider evidence outside the record, such as internet research about the reliability of hair-follicle tests. *Burkhalter v. State*, 330 Ark. 684, 686–87, 956 S.W.2d 171, 173 (1997). An addicted parent's illegal drug use and instability may demonstrate a risk of potential harm for the children. *Murphy v. Ark. Dep't of Human Servs.*, 2018 Ark. App. 426, at 8–9, 560 S.W.3d 465, 471; *Robinson v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 262, at 5, 520 S.W.3d 322, 325 (holding that continued drug use demonstrates potential harm sufficient to support a best-interest finding in a termination-of-parental-rights case); *Matlock v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 184, at 8, 458 S.W.3d at 257–58 (holding that there was no merit to a sufficiency challenge because the mother minimally visited her child, refused all other services, was incarcerated multiple times during the case, was incarcerated at the time of the termination hearing, did not have a stable home, and admitted drug use).

The evidence presented to the circuit court was sufficient to support its best-interest finding. Despite many warnings from the court, Bratton failed to submit a sample for drug testing on August 22 and November 16, 2018. She tested positive for oxycodone on October

7

5, 2018, and failed to provide a prescription authorizing her to use that medication. She also failed to attend the second court-ordered hair-follicle test in October 2018. In addition to her drug use, Bratton also continued to live with people who used illegal drugs, violated the court's order regarding Richard Blasingame's contact with the children, returned the children to foster care with lice after visitation, and failed to address issues such as employment and transportation until mere months before the termination hearing. We hold that the court's potential-harm finding was not clearly erroneous.

Affirmed.

VIRDEN and SWITZER, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Ellen K. Howard*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.